FILED
COURT OF APPEALS
DIVISION II

2014 AUG 19 AM 9: 37

STATE OF WASHINGTON

BY

DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 43995-6-II |
| Respondent, | |
| v. | |
| RONALD HODGE HOLTZ, aka RONALD HOLTZ KEAL, | Consolidated with |
| Appellant. | |
| In re Personal Restraint Petition of | No. 45427-1-II |
| RONALD HODGE HOLTZ, | |
| Petitioner. | UNPUBLISHED OPINION |

HUNT, P.J. — Ronald Hodge Holtz (aka Ronald Holtz Keal) appeals his jury trial conviction and standard-range sentence for felony violation of a domestic violence court order. He argues that the trial court's instruction advising the jury that it had a duty to return a guilty verdict if it found that the State had proved each element of the offense beyond a reasonable doubt is not a correct statement of the law. He raises several additional issues in a Statement of Additional Grounds for Review[1] (SAG), a supplemental SAG, and a consolidated personal restraint petition (PRP). We affirm his conviction and sentence, and we deny his PRP.

---

[1] RAP 10.10.

Consolidated Nos. 43995-6-II and 45427-1-II

FACTS

## I. No Contact Order Violation

On September 19, 2011, Connie E. Elliott, the desk clerk on duty at the Sunshine Motel in Fife, overheard two people arguing just outside of one of the motel rooms. Elliott recognized the people involved as Clare Jane Strain and Ronald Holtz,[2] from previous contacts at the motel. A short time later, Elliott heard more arguing; saw Strain, who uses a cane, back out of the motel room's doorway; and saw Holtz "give [Strain] a shove to the chest." 3 Verbatim Report of Proceedings (VRP) at 263. Elliott called 911.

Fife Police Officer Allen Morales and Milton Police Officer Kevin Peterson responded to the 911 call. The officers contacted Strain and a man they later identified as Holtz. Both Holtz and Strain confirmed that they had been arguing, but they denied any physical altercation.[3] After Morales spoke to Elliott in the motel office, the officers arrested Holtz for assault. After arresting Holtz, Morales ran records checks on both Strain and Holtz and discovered a no contact order prohibiting Holtz from contacting Strain.[4]

## II. Procedure

The State charged Holtz with felony domestic violence (DV) court order violation and fourth degree assault. Before trial, Holtz was represented by series of attorneys. The trial court also granted numerous continuances over Holtz's objections.

---

[2] Strain was Holtz's girlfriend, with whom he was sharing a motel room.

[3] At trial, Strain admitted that she and Holtz had been arguing on September 19. But she could not "remember" if Holtz pushed her or touched her during their argument. 3 VRP at 190.

[4] In contrast, Peterson later testified that he discovered the no contact order before Holtz's arrest, after taking his identification.

### A. Motions To Suppress

Through counsel, Holtz moved to suppress all the evidence discovered at the motel, arguing that the officers lacked probable cause to arrest Holtz. Holtz did not argue that the officers had unlawfully searched the motel's guest registry. After the trial court heard testimony from Morales and Elliott, it denied Holtz's suppression motion.

Defense counsel then presented the court with a pro se suppression motion in which Holtz argued that the officers had unlawfully detained him, that they had unlawfully searched the motel's guest registry, and they would not have discovered the no contact order at issue if it were not for this unlawful search. The trial court did not consider this pro se motion, noting that it contained factual statements that were not in the record because Holtz had not testified at the suppression hearing and that Holtz had counsel; instead, the trial court placed the motion in the court record without action. In its written findings of fact and conclusions of law, the trial court addressed only the suppression issue litigated by counsel; it did not address Holtz's pro se motion.

### B. Bail Reduction Hearing

Two days before trial, Holtz moved for bail reduction and release, asserting that he was not receiving adequate medical treatment in jail. During the hearing on this matter, Holtz stated that he had numerous physical and mental health conditions, for which he was on social security disability. Although he described many of his physical problems, he did not describe his mental health issues beyond asserting that he had been treated at "Greater Lakes," that he was "mentally

. . . disabled," and that he was not receiving any kind of "treatment" in jail.[5] VRP (Aug. 28, 2012) at 6. The trial court denied his motion for bail reduction and release.

## C. Trial

On the day of trial, defense counsel advised the trial court that Holtz had requested a continuance to allow him to obtain "a competency evaluation and possibly a diminished capacity evaluation." 1 VRP at 19. Addressing the trial court himself, Holtz again stated that he was physically and mentally disabled and that he was not taking any mental health medication. This time, he also stated that he had "six mental health conditions" and that he had "had nine evaluations" and had had some type of involvement with Western State Hospital.[6] 1 VRP at 20. The trial court denied this motion.

Before completing jury selection, the trial court notified the parties that it had some brief, unintentional contact with some of the jurors on its way to the courtroom. Neither party expressed concern about this contact.

The State's witnesses testified as described above. Holtz did not present any evidence. The State also presented copies of (1) two Lakewood Municipal Court orders showing that Ronald H. Keal had previously been convicted of violating protection orders, and (2) a copy of a Pierce County Superior Court judgment and sentence showing that Ronald Holtz Keal had pled guilty to violating a protection order. A fingerprint expert testified that the fingerprints on these documents matched the fingerprints taken from Holtz when he was booked on this offense.

---

[5] It does not appear that Holtz submitted any documents supporting this motion.

[6] Although Holtz may have had some records with him at this hearing, they are not part of the record before us.

Before Morales, Peterson, and Elliott testified, the trial court, at defense counsel's request, allowed the parties to voir dire these witnesses about various matters, including whether Elliott had shown them the motel's registry when they responded to her 911 call. Although the trial court initially considered ruling on additional suppression issues, it later stated that these issues had been addressed by another judge and refused to make any additional rulings.

Following the State's final witness but before the State rested, the trial court addressed several "halftime" motions. 3 VRP at 301. The State rested its case before the jury the following afternoon after the court addressed some additional issues.

### D. Jury Instructions

Holtz proposed a felony "violation of a no-contact-order to convict" jury instruction that contained the following language: "If you find from the evidence elements (1), (2), (3)[,] (4) and (5), have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty." Clerk's Papers (CP) at 138. Although the trial court's to-convict instruction, number 10, differed slightly from Holtz's proposed instruction, it stated that if the jury found all of the elements set out in the instruction, "it will be your duty to return a verdict of guilty." CP at 109 (Jury Instruction 10).

### E. Verdict and Sentencing

The jury found Holtz guilty of felony violation of a DV court order, but not guilty of fourth degree assault. The jury further found by special verdict that Holtz did not violate the no contact order by committing an assault but that he had "twice been previously convicted for violating the provisions of a court order." CP at 131. At sentencing, over Holtz's objection, the

trial court calculated Holtz's offender score as more than nine points. The trial court also denied

Holtz's request for a lower sentence based on his numerous mental and physical health issues.[7]

Holtz appeals his conviction and sentence. He also challenges his conviction and

sentence in a PRP, which we have consolidated with his direct appeal.

ANALYSIS

I. DUTY TO RETURN A GUILTY VERDICT

Holtz first challenges Jury Instruction 10, the to-convict instruction for felony violation

of a DV court order. He argues that this instruction misstated the law by advising the jury that it

had a "duty to return a verdict of guilty" if the evidence proved all elements beyond a reasonable

doubt when there is no such requirement in the State or Federal constitutions.[8] Br. of Appellant

at 19. The State argues that the invited error doctrine precludes this argument. We agree with

the State.

The invited error doctrine "prohibits a party from setting up an error at trial and then

complaining of it on appeal." *State v. Pam*, 101 Wn.2d 507, 511, 680 P.2d 762 (1984),

---

[7] Defense counsel apparently presented the trial court and the State with "a plethora of documents" related to Holtz's physical and mental health issues; but these documents are not in the record before us. VRP (Sept. 21, 2012) at 5. The only document we have that refers to any mental health issues is the "Problem List" completed at the Pierce County Detention and Corrections Health Clinic stating that Holtz had a history of anxiety and depression. CP at 149. Defense counsel did, however, tell the trial court that Holtz reported "a history of bipolar disease, . . . , schizoaffective disorder, antisocial personality disorder, [attention deficit and hyperactivity disorder], with serious post traumatic stress disorder, and anxiety." VRP (Sept. 21, 2012) at 9.

[8] Holtz argues that he may raise this issue for the first time on appeal under RAP 2.5(a)(3). But RAP 2.5(a)(3) does not allow a defendant to make an argument that is prohibited by the invited error doctrine. *State v. Henderson*, 114 Wn.2d 867, 869-70, 792 P.2d 514 (1990); *see also State v. Corbett*, 158 Wn. App. 576, 593 n.11, 242 P.3d 52 (2010) (distinguishing invited error from a mere failure to object to a constitutionally erroneous instruction).

*overruled on other grounds by State v. Olson*, 126 Wn.2d 315, 319-21, 893 P.2d 629 (1995). When a defendant has proposed instructions that the trial court gave to the jury, the defendant cannot appeal on the ground that his own proposed instructions were improper, even if the instruction potentially violated his constitutional rights. *State v. Henderson*, 114 Wn.2d 867, 868-69, 792 P.2d 514 (1990). Here, Holtz proposed a felony violation of a DV court order instruction that contains language identical to the language he now asserts was improper.[9] Thus, the invited error doctrine prohibits Holtz from arguing that this to-convict instruction was incorrect, and we do not further consider this argument.[10]

## II.  SAG, SUPPLEMENTAL SAG, AND PRP ISSUES[11]

### A.  Search of Motel's Registry

Holtz next asserts that the officers conducted a warrantless search of the motel's registry, and that the officers would not have discovered the existence of the no contact order if not for this unlawful search. The trial court did not address this issue, which Holtz raised below in a pro se motion to suppress. Nevertheless, the record before us on appeal includes the voir dire

---

[9] Holtz does not argue that his trial counsel provided ineffective assistance by proposing this jury instruction.

[10] Even were we to consider the merits of this argument, it would fail. *See State v. Mecham*, ___ Wn. App. ___, 323 P.3d 1088, 1095 (2014) (Division One); *State v. Wilson*, 176 Wn. App. 147, 150-51, 307 P.3d 823 (2013) (Division Three), *review denied*, 179 Wn.2d 1012 (2014); *State v. Brown*, 130 Wn. App. 767, 770, 124 P.3d 663 (2005) (Division Two); *State v. Meggyesy*, 90 Wn. App. 693, 699-706, 958 P.2d 319 (Division One), *review denied*, 136 Wn.2d 1028 (1998), *abrogated on other grounds by State v. Recuenco*, 154 Wn.2d 156, 110 P.3d 188 (2005), *reversed by Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006).

[11] Unless otherwise noted, Holtz raises these issues in his SAG or his supplemental SAG.

testimonies of Morales, Peterson, and Elliott, which allows us to address this issue in the first instance.

During voir dire outside the jury's presence, Morales testified that arriving at the motel before Peterson, he (Morales) contacted Strain in her motel room, she told him her name, he then contacted Elliott in the motel office, but he did not look at the motel's guest registry. Peterson testified that when he arrived, Morales was already speaking to Strain, and he (Peterson) did not go to the motel office. Elliott[12] testified that when there were two officers present at the scene, she showed one of the officers the motel's registry, which contained Strain's name and identification. Regardless of whether Morales was the officer who examined the motel's registry, his and Peterson's testimonies established that Morales had already spoken to Strain and knew her name before any officer looked at the motel's registry. Thus, even if the search of the motel's registry were unlawful so as to require suppression of the information obtained from the registry,[13] it would not be necessary also to suppress the later discovery of the no contact order because Morales had already learned Strain's identity directly from her. *See State v. Green*, 177 Wn. App. 332, 343, 312 P.3d 669 (2013) (discussing "independent source exception" to the exclusionary rule). Thus, Holtz's suppression challenge, based on the registry search, fails.

---

[12] Again, although it appears that the trial court later refused to reconsider any suppression issues, it allowed Holtz's counsel to voir dire Elliott about whether any of the responding officers had examined the registry.

[13] We note, however, the unlikelihood that such a ruling would have resulted because any the search of the motel's registry here was not a random and suspicionless like the search of a motel registry in *State v. Jorden*, 160 Wn.2d 121, 130, 156 P.3d 893 (2007); *see also In re Pers. Restraint of Nichols*, 171 Wn.2d 370, 377, 256 P.3d 1131 (2011) (four justices holding that *Jorden* establishes only a limited right of privacy in motel registrations and that officers may search these records if they have individualized and particularized suspicion regarding the subject of the search; fifth justice concurs in result but does not concur in this reasoning).

## B. Initial Detention

Holtz next asserts that his initial detention, which he contends was from 9:33 PM through 9:54 PM, was improper because the officers lacked justification to hold his identification and tell him he was not allowed to leave. We disagree.

In the absence of probable cause to arrest, police may conduct a brief investigative detention known as a *Terry* stop. *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). A *Terry* stop must be based on "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *State v. Mendez*, 137 Wn.2d 208, 223, 970 P.2d 722 (1999) (quoting *Terry*, 392 U.S. at 21), *overruled in part on other grounds by Brendlin v. California*, 551 U.S. 249, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007). The level of articulable suspicion required is "'a substantial possibility that criminal conduct has occurred or is about to occur.'" *Mendez*, 137 Wn.2d at 223 (quoting *State v. Kennedy*, 107 Wn.2d 1, 6, 726 P.2d 445 (1986)). We examine the reasonableness of the officer's suspicion based on the totality of the circumstances known to the officer at the time of the initial detention. *State v. Glover*, 116 Wn.2d 509, 514, 806 P.2d 760 (1991).

Here, the officers were responding to a report of an assault in a particular motel room, Holtz and Strain admitted they had been arguing; and Elliott told the officers she had heard the arguing and had then seen Holtz "shove" Strain hard enough that she almost fell. VRP (June 4, 2012) at 12. These facts established a substantial possibility that criminal conduct had occurred. Thus, the officers' initial detention of Holtz was lawful.

## C. Scope of Search

Holtz next appears to assert that the officers unlawfully expanded the scope of their "search," which led to the discovery of the no contact order. SAG at 13. He contends that the officers did not have probable cause to expand the search because several eyewitnesses denied there having been an assault and the officers did not have Elliott identify Holtz in person at the scene. But Holtz fails to acknowledge that (1) Elliott had reported seeing a man assault Strain, and (2) Strain told the officers that she and Holtz had been arguing. These facts were sufficient to allow the officers to detain Holtz long enough to determine if a crime had in fact been committed and to run a background check, during which they discovered the no contact order. *See State v. Villarreal*, 97 Wn. App. 636, 645, 984 P.2d 1064 (1999), *review denied*, 140 Wn.2d 1008 (2000) ("A warrant check during a valid criminal investigatory stop is a reasonable routine police procedure so long as the duration of the warrant check does not unreasonably extend an initially valid contact.").

## D. Name Change

Holtz appears to assert that the officers presented false evidence at the suppression hearing and/or at trial. Holtz contends that the officers could not have linked him to the no contact order while at the motel because he had recently changed his name to Holtz and had not been previously arrested under that name. But it is pure conjecture that there was nothing in the records the officers relied on while at the motel that connected Holtz's new name to his previous

10

name.[14] To the extent there is information outside the record supporting this claim, we cannot consider it on direct appeal. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995) (the proper procedure for raising issues dependent on matters outside the record is a PRP). To the extent Holtz is challenging the weight and credibility of the officers' testimonies, we do not address such issues on appeal. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990); *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533, *review denied*, 119 Wn.2d 1011 (1992), *abrograted on other grounds by In re Pers. Restraint of Cross*, ___ Wn.2d ___, 327 P.3d 660, 673 n.8 (2014).

### E. Elliott's In-court Identification

Holtz next argues that Elliott's in-court identification during the suppression hearing "was impermissibly suggestive and prejudiced all proceedings." SAG at 18 (some capitalization omitted). Again, we disagree.

Regardless of whether Elliott's in-court identification during the suppression hearing was "impermissibly suggestive,"[15] it was also cumulative because Morales also identified Holtz. And there was ample additional evidence, including Strain's testimony, establishing the no contact

---

[14] Holtz appears to claim that the prosecutor admitted that the officers did not identify him (Holtz) until he was booked into jail and "identified" there. SAG at 9. But the part of the record Holtz cites merely suggests that his identity was confirmed once he was booked into jail, not that the officers did not have reason to believe Holtz was the person named in the restraining order soon after they first contacted him at the motel.

[15] SAG at 18.

order violation.[16] Moreover, the jury acquitted Holtz of the assault charge and found that he had not violated the no contact order by assaulting Strain.

### F. Sufficiency of Evidence

Holtz next appears to assert there was insufficient evidence to establish that he committed the crime. He appears to be referring either to the assault or to whether he violated the no contact order by assaulting Strain.

In considering a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and ask whether any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A claim that the evidence was insufficient admits the truth of the State's evidence and all reasonable inferences drawn from that evidence. *Salinas*, 119 Wn.2d at 201. Because the jury acquitted Holtz of the assault charge and found that he did not violate the DV court order by assaulting Strain, there is no need to evaluate the sufficiency of the evidence as to whether an assault occurred.

### G. Speedy Trial/Continuances

#### 1. Record

Holtz next asserts that the trial court violated his "speedy trial" rights by granting numerous continuances over his objections. SAG at 25. He refers us to proceedings that were held on (1) October 25, 2011; (2) November 29, 2011; (3) December 6, 2011; (4) February 14, 2012; (5) March 6, 2013; (6) May 10, 2012, and (7) May 24, 2012. In his supplemental SAG,

---

[16] To the extent Holtz is also challenging Elliott's credibility at the suppression hearing, we note that credibility determinations are matters for the trial court and are not subject to our review. *See Camarillo*, 115 Wn.2d at 71; *Walton*, 64 Wn. App. at 415-16.

Holtz also asserts that deficiencies in the appellate record have violated his right to appeal, and he attaches copies of several orders granting multiple continuances.[17] In the interests of justice and to allow for effective review, we consider these attached documents as if they were part of the record before us on appeal. *See* RAP 9.10; RAP 1.2(c). Our consideration of these documents attached to Holtz's supplemental SAG render moot his claim that the incomplete appellate record denied him his right to appeal. And because Holtz does not explain how additional requested transcripts would assist him in his appeal, we deny his request for additional transcripts.

## 2. CrR 3.3 Time-for-Trial Standard of Review

Despite the time for trial periods set forth in CrR 3.3, "[t]rial within 60 days is not a constitutional mandate." *State v. Terrovona*, 105 Wn.2d 632, 651, 716 P.2d 295 (1986). Nor is there any "constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months." *Barker v. Wingo*, 407 U.S. 514, 523, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). Moreover, a trial court may continue a trial under CrR 3.3(f)(2) when a continuance is "required in the administration of justice" and the "defendant will not be prejudiced" in the presentation of his defense.

---

[17] The record before us on appeal does not include orders or transcripts for the hearings on October 25, 2011 (October 25, 2011 transcript states, "Omnibus Order signed off the record." VRP (Oct. 25, 2011) at 2); November 29, 2011 (November 29, 2011 transcript states, "Nothing on the record in front of Judge Murphy." VRP (Nov. 29, 2011) at 2); December 6, 2011; March 20, 2012; or May 10, 2012. Holtz, however, has attached to his supplemental SAG orders continuing the trial from each of these dates, except May 10, 2012. But according to the records before us, there was no continuance granted on May 10, 2012, only a conference hearing. Consistent with our records, the order Holtz attached to his supplemental SAG does not suggest that the court granted a continuance on May 10; on the contrary, the April 19, 2012 order notes it was the sixth continuance, and the May 24, 2012 order shows it was the seventh continuance, implying that there was no additional intervening continuance on May 10, as Holtz asserts.

Absent a showing of manifest abuse of discretion, we will not disturb a trial court's grant or denial of a CrR 3.3 continuance or extension request. *State v. Williams*, 104 Wn. App. 516, 520-21, 17 P.3d 648 (2001). A trial court abuses its discretion if it bases its decision on untenable grounds or on untenable reasons. *Williams*, 104 Wn. App. at 521. It is not a manifest abuse of discretion for a trial court to grant a continuance to allow defense counsel an opportunity to prepare for trial, even over the defendant's express objections, in order to ensure effective representation and a fair trial. *Williams*, 104 Wn. App. at 523 (citing *State v. Campbell*, 103 Wn.2d 1, 15, 691 P.2d 929 (1984), *cert. denied*, 471 U.S. 1094 (1985)). Similarly, CrR 3.3(e)(8) allows a trial court to extend the time of trial for "[u]navoidable or unforeseen circumstances." Our courts have consistently held that the unavailability of counsel may constitute an unforeseen or unavoidable circumstance, warranting a trial extension. *See State v. Carson*, 128 Wn.2d 805, 814, 912 P.2d 1016 (1996).

### 3. No manifest abuse of discretion in granting continuances

Based on the record before us on appeal, including the documents Holtz attached to his supplemental SAG, Holtz does not show that the trial court manifestly abused its discretion by continuing his trial or that the trial court violated his CrR 3.3 time for trial rights. Instead, the appellate record and Holtz's SAG-attached documents show that all but three of the continuances[18] were necessary to accommodate (1) appointed counsel's withdrawal and appointment of new defense counsel; (2) defense counsel's requests for additional time to interview witnesses, to draft motions, or otherwise to prepare for trial; (3) Holtz's newly filed

---

[18] We do not consider the June 5, 2012 continuance, for which the trial court *reduced* the time for trial period.

CrR 3.6 motion; (4) Holtz's desire to hire private counsel; (5) the prosecutor's unavailability because of scheduling conflicts or reasonably scheduled vacation; (6) the court's determination that it would be unable to complete trial efficiently because of its schedule; and (7) Holtz's filing an affidavit of prejudice against the assigned trial court judge. These reasons are proper under CrR 3.3(f),[19] and Holtz fails to show that the trial court abused its discretion in granting any of these continuances.[20]

---

[19] *See also State v. Ollivier*, 178 Wn.2d 813, 825 n.4, 312 P.3d 1 (2013) (continuances deemed necessary to allow defense counsel to adequately prepare for trial are proper, even over the defendant's objections), *petition for cert. filed* (U.S. May 7, 2014) (No. 13-10090); *Williams*, 104 Wn. App. at 522-23 (prosecutor's unavailability due to scheduling conflicts with other trials); *State v. Kelley*, 64 Wn. App. 755, 767, 828 P.2d 1106 (1992) (reasonably scheduled vacation).

[20] The first continuance, October 25, 2011, moved the original November 9, 2011 trial date to November 29 to allow defense counsel time to draft motions. At that time, 30 days remained in the CrR 3.3 time for trial period, which expired December 29.

The second continuance, November 29, moved the trial from November 29 to December 6 because defense counsel had withdrawn. At this point, 30 days remained in the time for trial period, which expired on January 5, 2012.

The third continuance, December 6, 2011, moved the trial to March 6, 2012, to allow new defense counsel to prepare, to investigate, and to negotiate. At this point, "30+" days remained in the time for trial period, which expired April 5, 2012.

The fourth continuance, March 6, 2012, moved the trial to March 20 because Holtz wanted to fire his assigned counsel and to obtain new private counsel. At this point, "30+" days remained in the time for trial period, which expired April 19. Suppl. SAG at Ex. 1.

The fifth continuance, March 20, 2012, moved the trial to April 19, again to accommodate Holtz's request to hire private counsel. At this point, "30+" days remained in the time for trial period, which expired May 19. Suppl. SAG at Ex. 1.

The sixth continuance, April 19, moved the trial to May 24 because the prosecutor was in trial and Holtz had just hired private counsel. At this point, 30 days remained in the time for trial period, which expired May 23.

The seventh continuance, May 24, moved the trial to May 31 because the State's newly assigned counsel was unavailable part of this time, the trial court had to hold a CrR 3.6 hearing, and new defense counsel had yet to interview eyewitness Elliot. The trial court ordered defense counsel to complete Elliot's interview before the end of the day May 29. At this point, 30 days remained in the time for trial period, which expired June 30.

The three remaining continuances (June 4, June 5, and June 7, 2012) are less obviously appropriate because they involved the trial court's schedule and courtroom availability issues.[21] On June 4, the trial court continued the trial to June 5, stating, "Judge does not have sufficient

---

The eighth continuance, May 31, moved the trial to June 4 because Holtz had filed a CrR 3.6 motion and the "primary officer" was unavailable to testify until the following week. At this point, 30 days remained in the time for trial period, which expired July 3. Suppl. SAG at Ex. 1.

The ninth continuance, June 4, 2012, moved the trial date to June 5 because the "Judge [did] not have sufficient available days [that] week to complete trial effectively." Suppl. SAG at Ex. 1. The trial court did not reset the expiration date; instead, it noted that 25 days remained on the "time-for-trial" clock.

The tenth continuance, June 5, moved the trial date to June 6 because there was no courtroom available. Again, the trial court did not reset the expiration date and noted that 24 days remained on the time for trial clock.

The record does not contain a copy of the eleventh continuance.

The twelfth continuance, June 7, moved the trial date to June 11 because Holtz had filed an affidavit of prejudice against the assigned trial court judge, no courtroom was available, and additional investigation (including defense witness interviews), was required. The trial court ordered the department of assigned counsel to address defense witness interview issues. Although the trial court did not recite the time-for-trial expiration date, it did note that 30 days remained on the time-for-trial clock.

The next order in the record was signed July 23, 2012; it noted a July 25 trial date, an August 25 expiration date, and 30 days remaining on the time for trial clock. The trial court did not reschedule the trial, which remained set for July 25.

The next continuance, July 25, moved the trial date to August 1 because the State's counsel was in trial and the continuance was short. The expiration date was September 1, with 30 days remaining on the time for trial clock.

[21] *See State v. Kenyon*, 167 Wn.2d 130, 137, 216 P.3d 1024 (2009) ("A court can allow a continuance due to congestion when it carefully makes a record of the unavailability of judges and courtrooms and of the availability of judges pro tempore."); *State v. Flinn*, 154 Wn.2d 193, 200, 110 P.3d 748 (2005) ("When the primary reason for the continuance is court congestion, the court must record details of the congestion, such as how many courtrooms were actually in use at the time of the continuance and the availability of visiting judges to hear criminal cases in unoccupied courtrooms.")

available days this week to complete the trial effectively."[22]  Supp. SAG at Ex. 1 (order continuing trial dated June 4, 2012).  On June 5, the trial court issued an order continuing the trial to June 6, solely due to courtroom unavailability.[23]  In neither instance, however, did the trial court reset the time-for-trial clock; thus, in the absence of contrary information, the expiration date remained the same as when the trial court had previously granted the May 31 continuance.

The only other continuance mentioning courtroom unavailability occurred on June 7.  But this continuance was based on several additional grounds, including Holtz's affidavit of prejudice against the assigned trial court judge and witness interview issues that the trial court ordered the Department of Assigned Counsel to address.  This June 7 continuance was not based *solely* on courtroom unavailability; and the other reasons alone justified the continuance.  Thus, this continuance, which reset the time for trial clock for 30 days, was not improper.  *See* CrR3.3(b)(5).

Because Holtz does not show that any continuance that reset his time for trial was improper, his denial of "speedy trial" argument fails.

---

[22] The June 4, 2012 continuance order stated:  "Judge does not have sufficient available days this week to complete trial effectively."  Suppl. SAG at Ex. 1.  Nevertheless, the order continued the trial to the next day, June 5, without restarting the speedy trial period; and June 5 was within the previous 30-day expiration period.

[23] The June 5 order is the only continuance in the record for which the trial court's sole stated reason for continuing the trial date was courtroom unavailability.  Again, the trial court did not restart the time for-trial clock and 24 days remained before the period expired.
    It appears that the court granted another continuance on June 6, resetting the trial date for June 7.  But there is no copy of a June 6 continuance in the record, so we cannot determine the reason for this continuance.

H. No Mental Health/Diminished Capacity Evaluation

Holtz next challenges the trial court's denial of his request for a competency evaluation and his counsel's failure to address a possible diminished capacity defense despite his (Holtz's) repeatedly informing the court and counsel that he had mental health issues.[24] These claims also fail.

If there is "reason to doubt" the defendant's competency, the trial court must obtain a medical report on a defendant's mental condition. RCW 10.77.060(1)(a). The defendant, however, has the threshold burden of establishing that there is reason to doubt his competency. *State v. Woods*, 143 Wn.2d 561, 604-05, 23 P.3d 1046, *cert. denied*, 534 U.S. 964 (2001). A defendant is incompetent if he "lacks the capacity to understand the nature of the proceedings against him or her or to assist in his or her own defense as a result of mental disease or defect." RCW 10.77.010(15). Here, Holtz actively participated in the proceedings. Although at times, Holtz had difficulty communicating with his counsel and/or the court,[25] nothing in the record suggests that at any point Holtz gave the trial court reason to doubt that he could understand the nature of the proceedings against him or assist in his defense. On the contrary, the record clearly

---

[24] Holtz presented this evidence in the context of (1) his requests for bail reduction and release; (2) his request for a competency and/or diminished capacity evaluation; and (3) sentencing.

[25] For example, before trial, Holtz was represented by several attorneys who withdrew because (1) Holtz refused to cooperate with them based on a perceived conflict, (2) he was not happy with their representation and had filed bar complaints or other legal actions against them, or (3) he had financial issues with them. And throughout the proceedings, Holtz (1) objected to or disagreed with his counsel's strategic decisions and insisted that counsel present his arguments to the trial court, regardless of counsel's judgment; (2) filed or sought to present pro se motions, despite being represented by counsel; (3) interrupted the trial court, often insisting that he must be heard because he was "making a record," VRP (Feb. 14, 2012) at 19; and (4) argued with the trial court even after it ruled, once to the point that the trial court had him removed from the courtroom.

18

shows that Holtz understood the nature of the proceedings and was an active participant in his defense. Having failed to meet his threshold burden, Holtz does not show that the trial court erred in denying his motion for a competency evaluation.

Furthermore, although Holtz presented evidence that he suffers from a variety of mental health issues and that he is considered disabled based (at least in part) on his mental health issues, nothing in the record explains how his mental health conditions affected his ability to form the necessary mental state required to prove the offense.[26] The mere "[e]xistence of a mental disorder is not enough, standing alone, to raise an inference that diminished capacity exists, nor is conclusory testimony that the disorder caused a diminution of capacity." *State v. Gough*, 53 Wn. App. 619, 622, 768 P.2d 1028, *review denied*, 112 Wn.2d 1026 (1989). Accordingly, based on this record, Holtz has not established that his counsel was ineffective for failing to pursue a diminished capacity defense.

## I. Effective Assistance of Counsel

Holtz next asserts that he received ineffective assistance of counsel on several grounds. To establish ineffective assistance of counsel, Holtz must show both that (1) his counsel's performance was deficient, and (2) this deficient performance prejudiced him. *State v. Thomas*, 109 Wn.2d 222, 225–26, 743 P.2d 816 (1987) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

---

[26] Diminished capacity allows a defendant to undermine a specific element of an offense, a culpable mental state, by showing that a given mental disorder reduced or eliminated his ability to achieve that mental state. *State v. Gough*, 53 Wn. App. 619, 622, 768 P.2d 1028, *review denied*, 112 Wn.2d 1026 (1989).

To the extent Holtz is asserting that his second appointed counsel forced him to forgo his speedy trial rights, as noted above Holtz does not establish that the trial court violated his time for trial right. To the extent Holtz is arguing that one of more of his appointed or hired counsel failed to investigate, failed to obtain evidence, or failed to call or interview certain witnesses, these arguments relate to matters outside the record and we will not address them further.

Holtz further asserts that his appointed counsel failed to request an instruction on "perjury-[i]nconsistent statements WPIC [WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS] or impeached testimony ER 806 and 801." SAG at 36. It appears that Holtz is asserting that his counsel should have requested jury instructions based on statutes related to the crime of perjury. *See* SAG at 36 (citing RCW 9A.72.010(1)). Such instructions are used in criminal cases involving perjury charges; they are not used to instruct the jury on witness credibility issues. Holtz also cites to hearsay rules and appears to assert that additional instructions were necessary to allow the jury to evaluate witness credibility in light of impeachment testimony. But the trial court properly instructed the jury on how to evaluate witness credibility in jury instruction 1,[27] and Holtz does not show that any additional

---

[27] The trial court instructed the jurors that they were "the sole judges of the credibility of each witness," and instructed the jurors that in evaluating a witness's testimony, they could consider:

> the opportunity of the witness to observe or know the things he or she testifies about; the ability of the witness to observe accurately; the quality of a witness's memory while testifying; the manner of the witness while testifying; any personal interest that the witness might have in the outcome or the issues; any bias or prejudice that the witness may have shown; the reasonableness of the witness's statements in the context of all of the other evidence; and any other factors that affect your evaluation or belief of a witness or your evaluation of his or her testimony.

CP at 99 (Jury Instruction 1).

instructions were required to assist the jury in evaluating the testimony. Accordingly, Holtz does not establish ineffective assistance of counsel on these grounds.

## J. Prosecutorial Misconduct and *Brady*[28] Violation

Holtz next asserts that the State engaged in several instances of "misconduct" and that it violated *Brady v. Maryland*, by failing to provide relevant evidence in discovery. SAG at 39.

To prevail on a claim of prosecutorial misconduct, Holtz must show "'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008) (quoting *State v. Hughes*, 118 Wn. App. 713, 727, 77 P.3d 681 (2003)). Holtz must demonstrate prejudice by proving that "'there is a substantial likelihood [that] the instances of misconduct affected the jury's verdict.'" *Magers*, 164 Wn.2d at 191 (alteration in original) (quoting *State v. Pirtle*, 127 Wn.2d 628, 672, 904 P.2d 245 (1995)); *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). If Holtz failed to object, the "failure to object to an improper remark constitutes a waiver of error unless the remark is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995); *accord State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009).

Holtz contends that some of the State's comments during the proceedings prejudiced the court against him. Specifically, he cites an instance in which the State commented to the trial court that Holtz had been manipulative in another case, was delaying the proceedings by repeatedly insisting he was entitled to new counsel, and was likely to continue to do this

---

[28] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

regardless of who was appointed as his counsel.[29] Holtz personally objected to these comments. The trial court could have reached these same conclusions based on its own observations of Holtz's actions in courtroom, such as his open disagreements with his counsel, his insistence that his counsel present motions even against counsel's advice that they lacked merit, and his argumentative approach to both counsel and the trial court.[30] Holtz does not show that these comments, taken in context, were likely to have prejudiced the trial court against him or otherwise affected his trial.

Holtz further contends that the State knowingly allowed its witnesses to "fabricate" testimony during the suppression hearing about how the officers connected him (Holtz) to the protection order, which was in his previous name (Keal), and that the trial testimony later revealed these fabrications. SAG at 40. We have reviewed the record form the suppression hearing and the trial and find no relevant discrepancies. It is mere conjecture that the suppression hearing testimony was fabricated. Accordingly, Holtz does not establish prosecutorial misconduct on this ground.

---

[29] Although Holtz cites a non-existent June 25, 2012 record, it appears that he intended to cite the July 25, 2012 record.

[30] As noted above, throughout the proceedings, Holtz (1) objected to or disagreed with his counsel's strategic decisions and insisted that counsel present his arguments to the trial court, regardless of counsel's judgment; (2) filed or sought to present pro se motions, despite being represented by counsel; (3) interrupted the trial court, often insisting that he must be heard because he was "making a record," VRP (Feb. 14, 2012) at 19; and (4) argued with the trial court even after it ruled, once to the point that the trial court had him removed from the courtroom.

Holtz also contends that the State engaged in misconduct and violated *Brady* when it failed to provide relevant evidence in discovery. He claims that had the State provided these materials,[31] the outcome of the suppression hearing would have been different.

In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Evidence is material only if there is a reasonable probability that had the prosecution disclosed the evidence to the defense, the result of the proceeding would have been different. *State v. Thomas*, 150 Wn.2d 821, 850, 83 P.3d 970 (2004). But the evidence Holtz argues would have assisted him appears to be outside the record; accordingly, we cannot address this issue on direct appeal.

### K. Judicial Misconduct, Bias, or Prejudice

Holtz next alleges several instances of judicial misconduct, bias, or prejudice. None of these claims have merit.

The portions of the record to which Holtz refers show instances in which the trial court: (1) questioned defense counsel about whether Holtz wanted to represent himself pro se or obtain private counsel; (2) attempted to address Holtz's conflict of interest and ineffective representation claims; (3) attempted to manage the courtroom by limiting Holtz's direct interactions with the court to relevant matters and by cautioning Holtz that his courtroom

---

[31] On March 21, 2012, Holtz filed a motion requesting evidence from the State. In this request, he asked for the motel surveillance video, various "jail reports" and "booking information," "notes, and /or entries" from Officer Larkins, and the 911 call. CP at 15.

behavior could prejudice the jury[32]; (4) addressed speedy trial/continuance issues; (5) addressed mental health evaluation issues; (6) reviewed Holtz's pro se motion to suppress in chambers; (7) refused to consider Holtz's pro se motion to suppress; (8) briefly addressed a witness to clarify an answer during voir dire outside the jury's presence; (9) clarified one of the State's objections; (10) addressed various "halftime"[33] issues, including a several motions, after the State's last witness but before the State had rested its case before the jury; (11) discussed Holtz's request for a lesser included offense instruction; and (12) started to impose sentence before allowing Holtz his opportunity for allocution.[34] None of these portions of the record demonstrate any trial court misconduct, bias, or prejudice.

## L. Public Trial and Right To Be Present

Holtz next asserts that the trial court denied him his constitutional right to a public trial (1) by having inadvertent contact with some jurors as the court passed them in the hallway, (2) by holding two unreported conferences in chambers, and (3) by reviewing Holtz's pro se suppression motion in chambers. Holtz also asserts that the trial court violated either his right to a public trial or his right to be present when it continued to discuss the case on the record during

---

[32] This behavior included one instance where a jury member reported that Holtz was "mouthing comments" at the jury. 3 VRP at 298. After the juror informed the court of this behavior, the court cautioned Holtz that his "very emotive" behavior during testimony could negatively influence the jury. 3 VRP at 299.

[33] 3 VRP at 301.

[34] Although Holtz cites the September 12, 2012 record, it appears he intended to cite the September 21, 2012 record of the sentencing hearing. We note that although the trial court started to sentence Holtz without allowing allocution, the trial court later allowed Holtz to speak after defense counsel's reminder. Holtz's sentencing allocution fills approximately nine pages of the sentencing transcript. Thus, to the extent Holtz is also asserting that he was denied his right of allocution, that claim fails.

a February 14, 2012 hearing after he (Holtz) had been removed from the courtroom for continuing to argue with the trial court after it ruled on a motion. These claims fail.

"[N]ot every interaction between the court, counsel, and defendants will implicate the right to a public trial, or constitute a closure if closed to the public." *State v. Sublett*, 176 Wn.2d 58, 71, 292 P.3d 715 (2012). To determine whether a public trial violation has occurred, we must examine the alleged closure under the "experience and logic" test.[35] *Sublett*, 176 Wn.2d at 72-73. The first prong of this test is the "experience" prong, which requires us to examine "whether the core values of the public trial right are implicated." *Sublett*, 176 Wn.2d at 73. The second prong of the test is the "logic" prong, which requires us to determine "'whether public access plays a significant positive role in the functioning of the particular process in question.'" *Sublett*, 176 Wn.2d at 73 (quoting *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986)). To apply this test, we must be able to determine from the appellate record the nature of the alleged courtroom closure.

Because our review is limited to the record on appeal, we cannot determine whether the two chambers' conferences Holtz cites implicated his public trial rights.[36] And the record before us does not show that the trial court closed the courtroom when it spoke to counsel after Holtz was removed from the courtroom. Furthermore, we are unaware of any case law holding that

---

[35] Although only four justices signed the lead opinion in *Sublett*, Justice Stephens' concurrence created a majority who adopted the "experience and logic" test. *Sublett*, 176 Wn.2d at 136 (Stephens, J., concurring). More recently, a unanimous Supreme Court cited *Sublett* in applying the "experience and logic" test in *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 28-29, 296 P.3d 872 (2013).

[36] The proper procedure for raising issues dependent on matters outside the record is by way of a personal restraint petition. *McFarland*, 127 Wn.2d at 335. Although Holtz has filed a PRP, he raises this issue in his SAG, not his PRP.

inadvertent contact with jurors in a hallway or reviewing the parties' briefing in chambers implicates a defendant's public trial right. Accordingly, Holtz's claimed public trial violations fail.

As to Holtz's right-to-be-present claim,[37] a defendant has a constitutional right to be present at all critical stages of the proceedings. *State v. Ratliff*, 121 Wn. App. 642, 646, 90 P.3d 79 (2004). The February 14, 2012 hearing record shows that after Holtz was removed from the courtroom, the trial court (1) briefly addressed counsel about a notation it was making on the omnibus order stating that Holtz may want to represent himself; and (2) warned defense counsel that the appellate courts have held that if a defendant chose "to act out in court in front of your jury to try to sabotage your case," the superior court did not have to grant a mistrial. VRP (Feb. 14, 2012) at 21. The trial court's brief comments to counsel do not constitute a critical stage of the proceedings. Accordingly, Holtz's right to be present claim fails.

### M. Sentencing Issues

#### 1. 1988 offenses

Holtz appears to assert that the court that sentenced him in 1989 improperly considered two prior 1988 offenses (third degree assault and second degree robbery) as separate offenses even though the original sentencing court imposed concurrent sentences under former RCW 9.94A.360(6)(a)(1988). Whether the 1989 court properly sentenced Holtz is irrelevant to Holtz's current sentence. And, to the extent Holtz is attempting to assert that the trial court here

---

[37] We review de novo whether a trial court violated a defendant's constitutional right to be present. *State v. Irby*, 170 Wn.2d 874, 880, 246 P.3d 796 (2011).

improperly counted the two 1988 offenses as separate offenses when calculating his offender score, this claim fails.

The sentencing statute that applied here provided:

In the case of multiple prior convictions, for the purpose of computing the offender score, count all convictions separately, except:

(i) Prior offenses which were found, under RCW 9.94A.589(1)(a)[38], to encompass the same criminal conduct, shall be counted as one offense, the offense that yields the highest offender score. The current sentencing court shall determine with respect to other prior adult offenses for which sentences were served concurrently or prior juvenile offenses for which sentences were served consecutively, whether those offenses shall be counted as one offense or as separate offenses using the "same criminal conduct" analysis found in RCW 9.94A.589(1)(a), and if the court finds that they shall be counted as one offense, then the offense that yields the highest offender score shall be used. The current sentencing court may presume that such other prior offenses were not the same criminal conduct from sentences imposed on separate dates, or in separate counties or jurisdictions, or in separate complaints, indictments, or informations;

(ii) In the case of multiple prior convictions for offenses committed before July 1, 1986, for the purpose of computing the offender score, count all adult convictions served concurrently as one offense, and count all juvenile convictions entered on the same date as one offense. Use the conviction for the offense that yields the highest offender score.

RCW 9.94A.525(5)(a).[39]

Holtz committed the two 1988 offenses after 1986, so the trial court was not *required* to count these offenses as one offense even if the 1988 court had imposed concurrent sentences. RCW 9.94A.525(5)(a)(ii). Furthermore, the record shows that the two 1988 offenses were

---

[38] The legislature amended former RCW 9.94A.589 (2002) in 2014. LAWS OF 2014, ch. 101, §1. This amendment did not change the relevant subsection; accordingly, we cite the current version of the statute.

[39] The legislature amended former RCW 9.94A.525 (2011) in 2013. LAWS OF 2013, 2nd Spec. Sess., ch. 35, §8. This amendment did not change the relevant subsections; accordingly, we cite the current version of the statute.

committed on different days and charged under different cause numbers. CP at 179, 186. Even though the court imposed concurrent sentences for these two offenses, they were clearly not same criminal conduct. RCW 9.94A.589(1)(a) (to be considered same criminal conduct, the offenses must be committed at the same time); *see also* former RCW 9.94A.400(1)(a) (1988) (to be considered same criminal conduct, the offenses must be committed at the same time). The trial court did not err in counting the 1988 offenses as separate offenses in Holtz's offender score.

## 2. No wash out

Holtz next asserts that his 1988 third degree assault[40] and second degree robbery[41] and 1990 first degree theft[42] convictions "[a]t some point must 'wash out.'" SAG at 46. This claim also fails.

Under RCW 9.94A.525(2)(b), class B felony offenses would wash out of an defendant's offender score "if since the last date of release from confinement (including full-time residential treatment) pursuant to a felony conviction, if any, or entry of judgment and sentence, the offender had spent ten consecutive years in the community without committing any crime that subsequently results in a conviction." Similarly, under RCW 9.94A.525(2)(c), class C felony offenses would wash out of the defendant's offender score "if, since the last date of release from

---

[40] Third degree assault is a class C felony. RCW 9A.36.031(2). The legislature amended RCW RCW 9A.36.031 in 2013. LAWS OF 2013, ch. 256, § 1. The amendments did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

[41] Second degree robbery is a class B felony. RCW 9A.56.210.

[42] First degree theft is a class B felony. RCW 9A.56.030(2). The legislature amended RCW RCW 9A.36.030 in 2013. LAWS OF 2013, ch. 322, § 2. The amendments did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

confinement (including full-time residential treatment) pursuant to a felony conviction, if any, or entry of judgment and sentence, the offender had spent five consecutive years in the community without committing any crime that subsequently results in a conviction." Although Holtz's criminal history shows a 13-year gap between his sentence for first degree robbery on January 5, 1994, and the date he committed his next offense in 2007, there is nothing in the record showing Holtz's last date of release from confinement for the 1994 first degree robbery conviction. Thus, based on this record, Holtz does not show that any of his previous class B or C felony offenses washed out of his offender score.

### 3. Rioting

Holtz next asserts that his rioting conviction is not a felony offense. Rioting is a gross misdemeanor *if* the defendant was not armed with a deadly weapon when he committed the offense. Former RCW 9A.84.010(2)(a) (2003).[43] It is a class C felony if the defendant was armed with a deadly weapon. Former RCW 9A.84.010(2)(b). The judgment and sentence shows that the rioting offense was a felony offense. To the extent Holtz is attempting to argue that his counsel was ineffective for failing to advise him that this was a felony offense, any discussions between Holtz and his counsel are outside the record, so we cannot address this issue further.

### 4. Constitutional challenges

Holtz next appears to assert the 2008 amendments to RCW 9.94A.500(1) and RCW 9.94A.530(2) were unconstitutional because they shifted the burden of proof of the prior convictions to the defense. This claim also fails.

---

[43] The former crime of "rioting" is now called "criminal mischief." RCW 9A.84.010; LAWS OF 2013, ch. 20, §1.

In 2008, the legislature amended former RCW 9.94A.500(1) (2006) to state, "A criminal history summary relating to the defendant from the prosecuting authority . . . shall be prima facie evidence of the existence and validity of the convictions listed therein." LAWS OF 2008, ch. 231, § 2. At the same time, the legislature also amended former RCW 9.94A.530(2) (2005) to state, "Acknowledgement includes . . . not objecting to criminal history presented at the time of sentencing." LAWS OF 2008, ch. 231, §4.

We do not address the 2008 amendment to RCW 9.94A.530(2) issue because Holtz objected to the criminal history the State presented at sentencing, so the presumption did not apply here. We now turn to RCW 9.94A.500(1).

In *State v. Hunley*, 175 Wn.2d 901, 914-16, 287 P.3d 584 (2012), our Supreme Court held that the 2008 amendment to former RCW 9.94A.500(1) was unconstitutional *as applied*. It further held that if the State provided sufficient evidence to establish the prior convictions along with any summary, RCW 9.94A.501(1) could be constitutionally applied. *Hunley*, 175 Wn.2d at 917. Our record contains copies of the records the State submitted to establish Holtz's prior convictions, and Holtz does not now contend that those records were incomplete or inaccurate. Accordingly, Holtz has not shown that amended RCW 9.94A.500(1) was unconstitutional as applied here.

5. Community custody status

Holtz further contends that his offender score was incorrect because he was not on

community custody at the time he committed the current offense. It appears that Holtz is relying on facts that relate to another, previous conviction, to support this argument. Because this record is not before us, we decline to consider this issue further. *See McFarland,* 127 Wn.2d at 335.

### N. Proof of Previous No Contact Order Violations

Finally, in his SAG and his PRP, Holtz challenges the validity of his predicate no contact order violation convictions, asserting that the complaints in those matters did not allege the essential elements of the crimes. He contends that because the charging informations were deficient, these prior offenses cannot be used to support the felony charge or to increase his offender score.

Holtz cannot collaterally attack his earlier convictions by raising these issues in this appeal unless he can demonstrate that the prior convictions were void rather than merely erroneous. *City of Seattle v. May,* 171 Wn.2d 847, 861, 256 P.3d 1161 (2011); *see also State v. Dereiko,* 107 Wash. 468, 470, 182 P. 597 (1919); *State v. Johnston,* 17 Wn. App. 486, 497, 564, P.2d 1159, *review denied,* 89 Wn.2d 1007 (1977). Holtz does not show that his prior convictions

31

Consolidated Nos. 43995-6-II and 45427-1-II

were void.[44] Accordingly, Holtz is not entitled to relief on this ground.

We affirm Holtz's conviction and sentence and deny his personal restraint petition.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Hunt, P.J.

We concur:

Worswick, J.

Melnick, J.

---

[44] Holtz's reliance on cases stating that informations must contain the essential elements of the charged offense is misplaced. The cases Holtz cites address challenges to informations related to the convictions the appellants were appealing, not to the convictions' underlying, predicate offenses. *See State v. Leach*, 113 Wn.2d 679, 782 P.2d 552 (1989); *State v. Cochrane*, 160 Wn. App. 18, 253 P.3d 95 (2011); *City of Bothell v. Kaiser*, 152 Wn. App. 466, 217 P.3d 339 (2009).